# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: JULY 9, 2020
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2018-SC-000670-TG

FINAL

DATE 7/30/20

JULIUS CATLETT JR.                                                    APPELLANT

|  | ON TRANSFER FROM COURT OF APPEALS |
| V. | CASE NO. 2018-CA-001746-MR |
|  | CHRISTIAN CIRCUIT COURT NO. 16-CR-00629 |

COMMONWEALTH OF KENTUCKY                                APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

A Christian Circuit Court jury convicted Appellant, Julius Catlett Jr., of the murder of Shaun Smith, possession of a handgun by a convicted felon, and of being a persistent felony offender. Catlett was sentenced in accordance with the jury's recommendation to sixty-five years' imprisonment and now appeals to this Court.[1]

On appeal, Catlett alleges the trial court erred by: (1) failing to exclude a photo identification, (2) allowing victim impact t-shirts to be worn in the courtroom during trial, (3) failing to grant a directed verdict on the murder charge, (4) allowing the Commonwealth to misrepresent expert witness testimony in closing argument, (5) allowing prejudicial police investigation

---

[1] Catlett filed his appeal at the Court of Appeals. However, because Ky. Const. § 110(2)(b) provides an appeal to this Court as a matter of right in cases garnering a sentence of 20 years or more, we granted transfer.

evidence, (6) allowing impermissible hearsay testimony by a detective, and (7) failing to trifurcate the sentencing portion of the trial.

For the following reasons we affirm Catlett's convictions and corresponding sentences.

## I. BACKGROUND

Shaun Smith was shot and killed in the early morning hours of September 4, 2016, in Hopkinsville, Kentucky. Smith and friends drove to an annual block party and the shooting followed an argument in the middle of the street between Smith and Austin Teague. The police were unable to locate any witnesses who saw who fired the shots; however, when police arrived at the scene within minutes after the shooting, someone in the crowd yelled, "50 did it." The police investigation focused on "50"—the only name they had. According to narcotics detectives, Catlett's street nickname was "50." Therefore, the murder investigation focused on Catlett.

Smith's second cousin and key prosecution witness, Myesha Hill, was sitting in a friend's car near a church parking lot waiting for the block party to end after police responded to noise complaints. Hill observed a car stop in the middle of the street and an argument take place between two men. As the argument escalated, a crowd gathered and blocked Hill's view of the two men. Although she could hear the argument and gunshots, Hill did not see who fired the shots. However, prior to the shooting, Hill saw a short black man with a red shirt and dreadlocks go to a white SUV, get a handgun, and put it in his waistband. Hill did not see what the man did next, but after the shots, Hill

2

saw several men get into the white SUV and leave. The man she had seen earlier with the gun was among the men who left in the SUV.

Hopkinsville Police Department Detective Joseph Garcia interviewed Hill twice on the morning of the shooting. The second interview included showing Hill a photo array. Hill circled Catlett's photo as the man she saw with the handgun. At trial, Hill was certain Catlett was the one with the gun.

Other witnesses reported what they saw happen from different vantage points and provided police with significant details about the argument and shooting. Only one of these witnesses, Devonte Cousar, identified Catlett as the shooter. Cousar was a passenger in Smith's vehicle and a close friend of Smith. Cousar said he was talking to Carla Taylor and standing next to Smith's automobile when his friend was shot.

According to Cousar, Teague came off a porch and into the middle of the street to argue with Smith. Cousar saw Catlett on the porch in a red shirt. When Cousar went to talk to Taylor, a short man brushed by him, whom he described as a dark-skinned man with dreadlocks wearing a red shirt. However, Cousar did not see a gun. Cousar did not make an identification from a police photo array, but two days after being shown the array, Cousar told police that a photo from a Facebook post was the man he believed was the shooter. The photo was Catlett. At trial, Cousar identified Catlett as the shooter.

Carla Taylor said she witnessed the argument between Smith and Teague. Taylor said she tried to get Smith to move his car from the middle of

3

the street where it was blocking traffic. Taylor said while she was talking to Smith, someone slid around her and fired the gun. Carla saw the muzzle flash, but not the shooter. Carla described the man that slid around her as a black man wearing a red or black shirt and having either braids or cornrows. She was shown the police color photo array and did not pick Catlett's picture. Taylor said she did not see Catlett that night.

Maurice Williams was standing next to Smith as Smith and Teague argued. Williams said the shots came from behind Smith. While Williams could not see who fired the shots, he described a man with a red hat and a chrome revolver. Williams said Teague did not have a gun. Williams did not identify Catlett.

Teague said he remembered arguing with Smith but did not remember seeing Catlett (who he called J.R.) that night. Teague said Catlett had short hair. Teague did not refer to Catlett as "50."

Ernest Little testified that Catlett was with him at a party in Clarksville, Tennessee the night of the shooting. Little claimed he remembered the party because it was his sister's birthday and hundreds of people were there.

In addition to interviewing witnesses, the police investigation included searching the home where Teague lived. There, officers found a shoe box in a crawl space containing marijuana, eight 9mm bullets, several cellphones, a storage baggie containing a white powdery substance, two boxes of .38 special bullets, cocaine residue, a digital scale, and a sealable bag of marijuana. Officers found a contact listed as "50" on two of the cellphones they found in

4

the crawlspace of Teague's home. One of the phones from the crawlspace was logged onto a Facebook account with a message sent to J.R. Catlett.

Police executed a search warrant at Catlett's house where they found Catlett's identification, mail, and an old red YMCA t-shirt. The shirt was tested at the crime lab for gunshot residue and DNA. While the tests did not reveal DNA linking Catlett to the t-shirt, they did indicate the presence of gunshot residue on the t-shirt. Lab analysis determined Smith was shot at close range by a single revolver firing .38 special ammunition.

The day of the shooting, an arrest warrant was issued for Catlett. He was arrested ten days later in Evansville, Indiana, for giving police there a false identity. His Indiana mugshot ten days after the shooting showed Catlett with short hair.

Catlett was indicted in December 2016 and tried in November 2018. After being found guilty of murder, the trial court proceeded with a bifurcated penalty phase wherein Catlett was found guilty of possession of a handgun by a convicted felon and of being a first-degree persistent felony offender. The jury recommended a sixty-five-year sentence, which was imposed by the trial court.

## II. ANALYSIS

### A. Myesha Hill's Photo Array Identification

Catlett first argues the trial court erred in failing to exclude Hill's identification of Catlett from a police photo array. Hill identified Catlett as the man she saw retrieve a handgun from a white SUV prior to the shooting and leave in that same vehicle after the shooting. Hill was the Commonwealth's key

5

witness, and her selection of Catlett from a black and white photo array marked Catlett's only identification in a police photo array. A photo array of the same individuals (but with color photographs) was shown to witnesses Cousar, Williams, and Taylor. After failing to identify Catlett from a photo array, two days later Cousar identified Catlett based on a Facebook photo.

Before we begin our analysis, we note the video record on this issue is incomplete. Written documents in the record, including handwritten docket notations by the trial court, indicate an evidentiary hearing began on July 24, 2017, and continued to July 28, 2017. On July 28, 2017 the trial court's handwritten notations include a briefing schedule. Written documents in the record also include two motions by Catlett: one requesting an evidentiary hearing and one to suppress the identification. The written record also includes the Commonwealth's response to the motion to suppress and the trial court's order denying the suppression motion.

The video record contains the portion of the hearing held on July 28, but not July 24. The trial court began the July 28 hearing by noting it was a continuation of a hearing begun "the other day" and by telling the defense to call its *next* witness. The trial court's words clearly indicate the hearing began on an earlier date.

The missing portion of the hearing from July 24 is important for two reasons. First, it contains whatever arguments counsel made to the court before the hearing began; and, second, it contains the testimony of Hopkinsville Police Department Detective Joseph Garcia. July 24 was the only

6

occasion where Detective Garcia testified under oath about the photo lineup he administered to Hill. The police interview containing Hill's photo identification was not video recorded and Detective Garcia was not called as a trial witness.

"It has long been held that, when the complete record is not before the appellate court, that court must assume that the omitted record supports the decision of the trial court." *Commonwealth v. Thompson*, 697 S.W.2d 143, 145 (Ky. 1985). In this case, that means we presume the missing portion of the video record fully supports the trial court's decision to overrule Catlett's motion to suppress the photo array identification by Hill.

The Commonwealth claims in its brief that the identification challenge issues raised by Catlett on appeal, outside of the challenge to the violation of Hopkinsville police procedures, were not raised before the trial court and as such cannot be raised now. We have long held that:

> An objection made in the trial court will not be treated in the appellate court as raising any question for review which is not within the scope of the objection as made, both as to the matter objected to and as to the grounds of the objection, so that the question may be fairly held to have been brought to the attention of the trial court.

*Richardson v. Commonwealth*, 483 S.W.2d 105, 106 (Ky. 1972). The Commonwealth requests the portion of Catlett's brief arguing a due process violation in the identification procedure be stricken because of that omission.

We decline to strike that portion of Catlett's brief that raises due process issues. In this instance, due process issues presumably arose during the missing portion of the hearing, and the trial court addressed those issues in the order denying the motion stating: "Specifically, the Defendant maintains

7

that the identification by Ms. Hill must be suppressed as it is unreliable and thereby a violation of his due process rights." We choose not to speculate, without a record to the contrary, why the trial court would use that language in the order if the issues were not raised and before the court.

The Commonwealth's written response to the motion to suppress, addressed some of the issues the Commonwealth now seeks to strike from appellate review, lending further support to the position that the trial court heard from the parties on the issue. Absent proof to the contrary that the issue was not raised before the trial court, we decline to strike that portion of Catlett's brief raising the challenge to the identification hearings on grounds other than it violated Hopkinsville Police Department procedures.

Although Catlett filed two motions regarding the procedures used during Hill's identification, the objection was not renewed at trial. In its order, the trial court stated that cross examination would ensure Catlett's rights were not violated. The trial court wrote:

> Assuming the identification of the Defendant by Ms. Hill on September 4, 2016 is offered into evidence at the trial, the Defendant will have a full and fair opportunity to cross examine Det. Garcia and/or Ms. Hill on the time, place, and manner of the identification. This opportunity to cross examine ensures the Defendant's due process rights are not impermissibly violated.

Catlett acknowledges that parts of the issue are not preserved, but requests those portions be reviewed for palpable error pursuant to KRE 103. "That rule requires a showing of 'manifest injustice,' and, in that respect, it parallels RCr 10.26." *Brock v. Commonwealth*, 947 S.W.2d 24, 28 (Ky. 1997).

8

We will review the unpreserved components of Catlett's issue for palpable error. That standard has multiple components and is set out as follows:

> Under RCr 10.26, an unpreserved error may be reviewed on appeal if the error is "palpable" and "affects the substantial rights of a party." Even then, relief is appropriate only "upon a determination that manifest injustice has resulted from the error." *Id.* An error is "palpable," only if it is clear or plain under current law. *Brewer v. Commonwealth*, 206 S.W.3d 343 (Ky. 2006). Generally, a palpable error "affects the substantial rights of a party" only if "it is more likely than ordinary error to have affected the judgment." *Ernst v. Commonwealth*, 160 S.W.3d 744, 762 (Ky. 2005). We note that an unpreserved error that is both palpable and prejudicial, still does not justify relief unless the reviewing court further determines that it has resulted in a manifest injustice; in other words, unless the error so seriously affected the fairness, integrity, or public reputation of the proceeding as to be "shocking or jurisprudentially intolerable." *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky. 2006).

*Miller v. Commonwealth*, 283 S.W.3d 690, 695 (Ky. 2009).

"When an appellate court engages in a palpable error review, its focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin*, 207 S.W.3d at 5.

As to the identification of Catlett by Hill and the procedures used by police in conducting that photo array, the trial court found that the identification procedure was not unnecessarily suggestive. The photo pack contained six black-and-white photographs mounted on a single page. In contrast the other photo arrays used by police in this case had one color photo per page. Photographs of the same six men were shown to all the witnesses.

Hopkinsville Police Department Lieutenant Tyler DeArmond explained at the suppression hearing held on July 28, 2017, that he put together the initial

9

photo array used by Detective Garcia. After hearing someone in the crowd at the scene shout, "50 did it," Lieutenant DeArmond assembled the photo array the same morning of the shooting. Lieutenant DeArmond was given Catlett's name by a narcotics detective who said it matched their records for someone with a nickname of "50."

Hopkinsville Police Department Detective Randall Green was the lead detective assigned to the case, and he explained at the suppression hearing that the photos came from a website accessible to police called Justice Exchange. According to Detective Green, the upside to using Justice Exchange is that it is faster, and the photos can be downloaded and printed immediately, whereas the Kentucky State Police generated photo arrays must be ordered and arrive sometimes days later. The downside to the Justice Exchange is the photos are black and white, while the KSP photos are color.

Detective Green further testified at the suppression hearing that the need to determine if Catlett was the man Hill saw was critical. According to Detective Green, if Hill identified Catlett, police needed to search for him; however, if she did not, the investigation would go in another direction. When Lieutenant DeArmond assembled the photo array, he was acting on the only information he had at the time. If that information proved wrong, it was essential to know that sooner rather than later.

Detective Green explained that the procedures set out in the Hopkinsville Police Manual were designed to be best practices. The procedure outlined in the Hopkinsville Police procedure manual was for an officer to show the

10

witness photographs individually and sequentially. However, as Green explained, circumstances could require an officer to do things differently than the best practices outlined in the manual. In this case, that meant showing Hill the photo array as soon as possible. Hill saw a black-and-white photo array at her home rather than an array of color photographs at the police station. The identification procedure was not recorded, which Detective Green said should be done if feasible. Furthermore, the photographs were shown on a single page, rather than individually and sequentially, as was done with the other witnesses.

A review of the photo array at issue here reveals six pictures of African American males. The six photographs show men of approximately the same age with hairstyles that, while varying to some degree, reflect Hill's description of the man she saw having his hair in dreadlocks. The amount and length of the hair varies slightly, but no one hairstyle stands out as markedly different. Nothing about Catlett's photo differentiates it from the others or calls attention to it.

One of Catlett's main arguments is that the photo array procedures employed in this case do not conform to Hopkinsville Police Department procedures as set out in the police procedure manual and are, therefore, impermissibly suggestive. However, whether a particular photo array is unduly suggestive is not determined solely by whether police follow a set of their own procedures. "It is the likelihood of misidentification which violates a

defendant's right to due process, and it is this which was the basis of the exclusion of evidence . . . ." *Neil v. Biggers*, 409 U.S. 188, 198 (1972).

In *King v. Commonwealth*, 142 S.W.3d 645, 649 (Ky. 2004), we made clear that Kentucky follows U.S. Supreme Court authority when it comes to evaluating claims of misidentification. We said:

> The determination of whether identification testimony violates a defendant's due process rights involves a two-step process. *Dillingham v. Commonwealth*, 995 S.W.2d 377, 383 (Ky. 1999) . . . . "First, the court examines the pre-identification encounters to determine whether they were unduly suggestive." *Id.* If not, the analysis ends and the identification testimony is allowed. "If so, 'the identification may still be admissible if under the totality of the circumstances the identification was reliable even though the [identification] procedure was suggestive.'" *Id. quoting Stewart v. Duckworth*, 93 F.3d 262, 265 (7th Cir. 1996) and *Neil, supra.*

*Id.* .

In this case, the trial court issued an order overruling Catlett's motion dated December 11, 2017, after the hearing on the motion to suppress. That order read:

> With regard to the identification made by Ms. Hill on September 4, 2016, there is nothing in the record to indicate that Det. Garcia or anyone else engaged in any conduct, expressed or implied, that would give rise to a conclusion that the identification was made under unnecessarily suggestive circumstances. Neither the fact that the interview with Ms. Hill was not recorded, nor the fact that Ms. Hill was the only one of the witnesses who was presented with a six pack photo array (as opposed to being presented one photograph at a time) provide a basis to exclude the identification.

The issues Catlett raised before the trial court included: the photo array shown at Hill's home, the interview was not recorded, the photo array was composed of six black-and-white photos on a single page, and the photo array was shown to Hill a few hours after the shooting. The trial court did not find

that any of these concerns rose to the level of being unduly suggestive. In fact, it is possible to surmise that showing Hill the photo array at her home instead of the police station may have produced less pressure on the witness to select someone than if she had been called to the police station to view the array in a law enforcement environment.

The use of black-and-white photos versus color photos is not a viable issue. Black-and-white photos are used in many mediums including advertising and are not so unusual or uncommon, as to be per se "suggestive." Furthermore, *all* of the images appeared in black-and-white—not just one or two, so as to make them stand out. A person's features are the same in color photos or black and white photos. The trial court found nothing in the procedures employed by the Hopkinsville Police Department or Detective Garcia that gave rise to the need to proceed past the "unduly suggestive" hurdle, and we agree with that assessment.

Upon review, we hold the trial court's decision was fully supported by the evidence. The trial court did not abuse its discretion in allowing the admission of Hill's identification from the photo array. Hill made a positive in-court identification of Catlett as the man she saw get a handgun out of the white SUV. Catlett's counsel was able to cross examine Hill and police over the issues surrounding that identification.

The trial court did not err in allowing Hill's identification of Catlett into evidence.

13

## B. Victim Impact T-shirt

Catlett's second assignment of error concerns the victim's mother Sharon Etter being allowed to wear a t-shirt with her deceased son's picture and wording on it during two days of trial. On the first day of trial, Etter wore a t-shirt with her son's photo along with the words "rest in peace." On the final day of trial, when she was called to testify during the penalty phase, Etter wore a t-shirt with Smith's photo bracketed by his dates of birth and death. Catlett objected on the first day of trial to the t-shirt but did not renew the objection during the remaining three days of trial.

When Etter was called to the stand during the penalty phase on the fourth day of trial, no contemporaneous objection was raised to the t-shirt she was wearing. Etter's testimony about her son and his age at the time of his death, the information discernable from Etter's t-shirt, was admissible during the penalty phase. KRS 532.055; KRS 421.500. When Catlett made the first and only objection to Etter's t-shirt on the first day of trial, counsel did not request a continuing objection and the trial court did not grant one.

KRE 103 sets out methods to preserve an issue for appellate review including timely objections or motions. A motion in limine resolved by order of record is sufficient to preserve an error for appellate review. Under limited circumstances, we have recognized that a continuing objection may suffice to preserve an issue for appellate review. We said:

> A single objection constitutes a continuing objection only when counsel specifically requests a continuing objection and the trial court specifically grants a continuing objection, or when the trial court on its own initiative clearly designates an objection as

14

continuing. It is the duty of counsel to object to the introduction of testimony as it is offered, unless from the record it clearly appears that the rulings made as to particular questions shall be applicable to all questions asked on the same subject matter and to all witnesses called.

*Davis v. Commonwealth*, 147 S.W.3d 709, 721 (Ky. 2004) (internal citations omitted).

In this case, no continuing objection was sought by Catlett or granted by the trial court. A review of this record does not indicate that Etter wore a similar t-shirt on other days of court proceedings or that Catlett raised an objection. Catlett's objection was not of a continuing nature because Catlett's counsel made clear that what they "feared" was that if the trial court allowed Etter to wear the objectionable t-shirt that day, then other family members would follow suit on other days and it would become a distraction. The trial court made clear that if large numbers of people showed up at trial wearing t-shirts and became a distraction, it would deal with that circumstance when it arose.

A review of the bench conference reveals that the objection to Etter wearing a t-shirt with victim impact information on day one was heard and overruled. Future problems, if they arose, would be handled when they occurred, presumably following the issue being brought to the trial court's attention or the trial court raising a concern sue sponte. Neither of those events occurred.

Our review will address the single objection to the trial court's decision to allow Etter to wear the t-shirt in question on the first day of trial. When it comes to the issue of in courtroom displays, we have stated:

> We take this opportunity to state that we generally disapprove of courtroom attire displaying images or messages of support for or against any party or issue in litigation. But, we recognize that remedial measures to restrict the practice are appropriate only when the display is capable of distracting the jury's attention from the trial proceedings, or it communicates to the jury an appeal for support or sympathy for one side of the case, which is often the intended purpose of the display. The trial court must eliminate any courtroom attire or display that is "so inherently prejudicial that [it would] deprive the defendant of a fair trial." *Carey [v. Musladin]*, 549 U.S. [70,] 72 [(2006)].

*Hammond v. Commonwealth*, 504 S.W.3d 44, 51 (Ky. 2016).

The trial court's focus is not on the display necessarily, but on the possible effect of the display on the jury. Issues surrounding the display– including what opportunity the jury had to observe the display and what the display was–must be considered by the trial court. We previously said:

> We decline, however, to conclude that the wearing of such clothing or buttons in the courtroom is so inherently unfair as always to constitute reversible error. Such a holding would cause a structural error to have occurred each time a potential juror caught a fleeting glimpse of a t-shirt or button bearing the likeness of a victim. Instead, we conclude that the best course in these situations is for the trial court to determine if the spectators' display caused the defendant to suffer any tangible prejudice.

*Allen v. Commonwealth*, 286 S.W.3d 221, 229 (Ky. 2009).

In this instance, the trial judge stated he did not see the t-shirt in question. According to the trial court, the failure to observe the t-shirt was due in part to the seating arrangement of the spectators in the courtroom. Based on what was said at the bench conference, it appears that the spectators were

16

seated behind the jury panel during questioning. Further, all counsel agreed that Etter was the only spectator wearing the t-shirt. The trial court also noted that once the jury was selected, the jurors would enter the courtroom from the jury room and would not see the spectators. The Commonwealth advised the trial court and counsel that she had admonished the victim's family not to have outbursts or comment on evidence or witnesses.

After counsel objected to Etter's wearing of the t-shirt, Catlett's counsel made clear the real cause for concern was the potential for distraction if other family members wore the same type t-shirts. As noted above, the trial court indicated it would handle that circumstance if or when it arose. There is nothing in the record indicating the circumstances Catlett feared became a problem during the remaining three days of trial. The trial court did not abuse its discretion in overruling Catlett's objection to Etter wearing the t-shirt.

## C. Directed Verdict on Murder

Catlett argues the trial court erred in denying his motion for directed verdict on the murder charge. The issue was preserved by Catlett's motions for directed verdict at the close of the Commonwealth's case and the close of all evidence. The focus of the motions were deficits in the Commonwealth's proof about the identity of the shooter. There was no doubt as to the other elements in the indictment based on the Commonwealth's proof about the cause and manner of Smith's death, the location in Hopkins County of the shooting, and the immediate circumstances surrounding the shooting. However, despite the presence of dozens of people on the street the night in question and the

17

testimony of five witnesses who were standing close to Smith when he was shot, the identity of the person who fired the five shots at close range was in dispute at trial.

"On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). "The trial court must draw all fair and reasonable inferences from the evidence in favor of the party opposing the motion, and a directed verdict should not be given unless the evidence is insufficient to sustain a conviction." *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983).

Further analysis of the trial record is essential for this analysis. The information previously discussed will not be repeated except as required to explain and highlight the circumstances revealed by the evidence.

The Commonwealth offered eyewitness testimony about the fatal shooting from Myesha Hill, Devonte Cousar, Carla Taylor, Maurice Williams, and Austin Teague. Although some of these witnesses were standing as close as arm's length from Smith when he was shot, none of them immediately identified Catlett as the shooter. We begin with a review of the testimony of the Commonwealth's most important witness, Hill.

Sitting in a parked car at the end of Younglove Street near a church parking lot as a block party wound down, Hill, Smith's cousin, was waiting for her friend to come out of a nearby house so they could leave. Hill's view of

some of the events was clear. Within hours of the shooting, Hill described and identified a man she saw remove a handgun from a white SUV to the police. Hill's description of the man included that he was wearing a red shirt, had dreadlocks, and most significantly, that she saw him put a handgun in his waistband.

While Hill had a clear view of the events leading up to the shooting, her view of the actual shooting was blocked by a crowd of people. She was unable to say if the man she saw get the gun from the SUV fired the shots. According to Hill, after the shooting, that man got in the white SUV with four other people and left before police arrived. Hill did not know Catlett before the shooting and did not know his nickname was "50"; nevertheless, Hill chose Catlett's picture from a photo array of six black and white photos. Hill's identification was made within hours of the shooting and led to an arrest warrant being issued for Catlett.

Smith, the victim of the shooting, began the evening driving around Hopkinsville with two friends. One of those friends was Devonte Cousar, who got out of the front passenger seat of the vehicle when Smith stopped the car on Younglove Street and was standing close to Smith talking to Carla Taylor when somebody brushed by him. Cousar's focus was on getting Taylor to help him get Smith back in the vehicle so they could leave, and as a result, Cousar did not see the shots, but immediately went to Smith—catching him as he fell to the ground.

Cousar described seeing a short black man with a buff body and dreadlocks in a red shirt after the shooting. Cousar said he thought he saw that man when they first pulled up and stopped the car. Cousar failed to pick Catlett's photo from a photo array despite knowing him as "50." However, two days after the shooting, Cousar identified Catlett from a Facebook post containing a photograph of Catlett's face. Cousar explained it took that amount of time and three police interviews for him to identify Catlett because he was numb and did not want to believe Smith's shooting and death had really occurred. Cousar said he was not initially sure in his own mind about the shooter, and not until he was sure, did he finally identify Catlett.

Another of Smith's friends, Maurice Williams, said he was drunk the night of the shooting and got out of the back seat of Smith's car when it stopped. Williams was standing next to Smith watching Teague, who was arguing with Smith and standing in front of Smith and Williams. According to Williams, neither Smith or Teague had a weapon that night. Williams never saw the shots as they were fired because the shots came from behind Smith and were fired at arm's length—a fact supported by the stippling found in Smith's neck wound during Smith's autopsy by Dr. Christopher Kiefer, the medical examiner. The only description Williams could provide police was a man with a red hat and a chrome revolver. Williams did not identify Catlett and testified he never saw Carla Taylor that night.

Taylor was related to Smith through a sister's grandchild. Taylor testified her memory of the night of the shooting "sucked" because she had

20

suffered other mental traumas since that night. Taylor did not recall talking to Cousar that night. However, she knew Catlett and did not pick him out of a photo array and she told police she did not see Catlett that night. Taylor said an unknown black male slid by her and fired shots from close to her side. Taylor did not see the shooter fire the shots, but did see the muzzle flash. Taylor told police the shooter had braids or cornrows and gave no description of his clothes other than he was wearing red or black. Taylor said she never saw the shooter's face.

Teague was in a verbal altercation with Smith when Smith was shot. Teague knew Catlett, called him "JR," and claimed he never used the nickname "50," despite having Catlett's number under that name in two of several cell phones recovered during the execution of a search warrant at his house. Teague testified he did not see Catlett the night of the shooting and Catlett had short hair at the time.

Additionally, Catlett called Ernest Little to testify about his whereabouts the night in question. Little testified Catlett was with him in Clarksville, Tennessee, at another party that night. Little said there were hundreds of other people at that party, but no one else was called to testify that they saw Catlett there.

Most of the remainder of the Commonwealth's evidence shed little light on the shooter's identity. Despite being only a couple of blocks from the shooting conducting a routine traffic stop and close enough for body cameras to pick up the sound of the five shots, police did not make it to the scene in

21

time to catch the shooter or locate the murder weapon. The seven spent shell casings police located near Smith's body did not match the projectiles recovered from Smith's body. According to Lawrence Pilcher, a firearms and ballistics expert from the KSP Central Crime Lab, a conclusion that could be drawn from the array of different caliber casings found at the scene probably meant the bullets that killed Smith were fired from a revolver and the shooter left no casings at the scene.

Police focus on Catlett as a suspect began when Hopkinsville Police Lieutenant DeArmond came to the scene and assisted with crowd control. Someone in the crowd shouted "50 did it." Lieutenant DeArmond did not recognize the nickname, so when he returned to the police station he contacted a narcotics detective who provided him with Catlett's name in connection to the nickname "50." Detective Bagby's information led police to execute a search warrant at Catlett's sister's house and the recovery of a red t-shirt. Based on Detective Bagby's information, police included Catlett's picture in the photo arrays shown to witnesses—including Hill, who was shown the photo array within a few hours of the shooting. Ultimately, police obtained an arrest warrant for Catlett the same day as the fatal shooting.

Upon executing a search warrant, officers found a red t-shirt in Catlett's room at his sister's house which tested positive for gunshot residue. J. David Clem, a forensic chemist with the KSP central lab, testified that finding the three elements (barium, antimony, and lead) that were necessary to determine

that there was gunshot reside present meant either the shirt was nearby when a gun was fired or the shirt came in contact with a gun that had been fired.

The medical examiner was able to determine there was stippling around the single shot to Smith's neck. Stippling is gun powder burned into the outer skin around a wound. Dr. Kiefer testified the presence of stippling meant the gun was anywhere from three inches to twenty-four inches away from Smith when the shot was fired. The remaining wounds were underneath clothes and Dr. Kiefer was unable to determine how close the gun was when they were fired. Dr. Kiefer testified that Smith was killed by a shot through the heart.

The KSP Central Crime Lab was unable to make any determinations from serology or DNA testing on the t-shirt. Hopkinsville Police department crime scene technicians recovered a spent shell casing in Smith's vehicle, but it also failed to match the fatal projectiles. Bullets in both plastic and cardboard holders found in Teague's house yielded no fingerprint matches from AFIS, the federal agency assisting local law enforcement with fingerprint matching. The Hopkinsville police were able to open various cellphones and determine that Teague had a contact for "50" as well as for "JR." A different cellphone had a Facebook account loaded on it, and when it updated, it included a message to "50" about a new phone number.

Finally, the Commonwealth called Detective Plynt of the Evansville Police Department. Ten days after the shooting, Detective Plynt was surveilling a known drug house in Evansville, Indiana, when a car pulled up, someone from the vehicle went inside, returned to the vehicle shortly thereafter, and the car

23

left the vicinity. Police followed the vehicle and pulled the car over suspecting narcotics trafficking.

When Detective Plynt questioned one of the passengers, the man gave two different dates of birth and a name that did not line up with information in the police system. The passenger was arrested for giving the police a false identity. Later at the jail, fingerprints revealed that the passenger was Catlett. Catlett's mugshot showed his hair was cut short.

At trial, Catlett's motions for directed verdict covered a great many of the shortcomings in the Commonwealth's evidence. "When considering whether the trial court erred in the denial of a directed verdict, this Court must consider all evidence favoring the Commonwealth as true and from that evidence, determine whether it is sufficient to induce a reasonable jury to believe beyond a reasonable doubt that the defendant is guilty of each and every element of the crime." *Pollini v. Commonwealth,* 172 S.W.3d 418, 428–29 (Ky. 2005) (citing *Benham,* 816 S.W.2d at 187).

Considering the evidence as true, Hill placed Catlett at the scene with a gun. Her identification of Catlett was made within hours of the shooting and Hill was careful and unmistakably clear in her testimony that she did not see Catlett fire the five shots. The witness identifying Catlett as the shooter was Devonte Cousar.

After much reflecting on the death of his close friend and making sure he was straight in his own mind about who fired the shots, Cousar identified Catlett as the shooter. Officers then found gunshot residue on a red t-shirt

24

recovered from Catlett's bedroom at his sister's house. Finally, Catlett was arrested in Indiana for using a false name and date of birth. When he was arrested, Catlett's hair was cut short.

It is these final pieces of information that give rise to much disagreement by Catlett on the inferences they create. However, juries are allowed to draw reasonable inferences from the evidence. As this court said about post-criminal-event activities: "But some inferences upon inferences are necessarily allowed. For example, in a criminal case, consciousness of guilt can be inferred from things like assumption of a false name after a crime—and, in turn, the 'fact of guilt' can be inferred from the defendant's consciousness of guilt." *Southworth v. Commonwealth*, 435 S.W.3d 32, 46 (Ky. 2014).

Evidence of fleeing has long been admissible and proof of a guilty heart. In describing the long history of allowing such evidence we said:

> It has long been held that proof of flight to elude capture or to prevent discovery is admissible because "flight is always some evidence of a sense of guilt." *Hord v. Commonwealth*, 227 Ky. 439, 13 S.W.2d 244, 246 (1928); *see also, e.g., Chumbler v. Commonwealth*, Ky., 905 S.W.2d 488, 496 (1995); *Hamblin v. Commonwealth*, Ky., 500 S.W.2d 73, 74 (1973). This common-law rule is based on the inference that the guilty run away but the innocent remain, which echoes more eloquent language from the Bible: "The wicked flee where no man pursueth; but the righteous are bold as a lion." *Proverbs* 28:1.

*Rodriguez v. Commonwealth*, 107 S.W.3d 215, 218–19 (Ky. 2003).

In summary, we conclude the trial court did not err when it overruled Catlett's motion for a directed verdict on the murder count of the indictment. After review, we conclude there was sufficient evidence for the case to proceed

25

to the jury. The many problems in the Commonwealth's proof that Catlett pointed out in his motions were best left for the jury to view, balance, and weigh in making its decisions. The trial court did not abuse its discretion in overruling Catlett's motions for directed verdict on the murder count of the indictment.

### D. Misstatement of Gunshot Residue Expert Testimony

Catlett next asserts that the Commonwealth erred in its closing argument when it made a misstatement concerning the gunshot residue testimony. The issue revolves around the testimony of J. David Clem, a forensic chemist specializing in trace evidence analysis. Clem's lab work at the KSP Central Crime Lab for Catlett's case was on gunshot residue analysis. Specifically, Clem analyzed the red-t-shirt recovered by Detective Green in Catlett's bedroom at his sister's house. Clem ran multiple procedures on the t-shirt looking for lead, antimony, and barium particles—the three elements conclusive for gunpowder. In one test, the procedures located nine particles and in a second procedure, ten additional particles. The ten particles are at issue because those particles, due to their composition, could have origins from something other than gunpowder, including someone working in a factory where car parts are made.

Catlett's appellate argument is largely focused on the prosecution's closing argument and the objection to the purported misstatement of what Clem said. The Commonwealth directs our attention to the objection, the ruling of the trial court to admonish the jury, Catlett's counsel's acceptance of

that admonition, and Catlett seeking no further relief following the admonition. The Commonwealth asserts Catlett received all the relief he requested and is not entitled to further relief on appeal. We agree.

A review of Clem's testimony is not required to resolve this issue. The parties disagreed over Clem's testimony about the results of the second procedure concerning the ten particles. When the Commonwealth said the ten particles had all three elements including barium, lead, and antimony, Catlett objected, and counsel asked to approach the bench. At the bench there was considerable discussion about whether Clem said the ten particles had all three elements present or just two. The trial court concluded there was a difference over Clem's testimony and advised the parties that he intended to admonish the jury. Catlett's counsel accepted that decision and did not further object to the wording of the admonition or otherwise request additional relief. Catlett's counsel remarked that was fine (in reference to the admonition), and said "thank you" before returning to the defense table.

When a party objects, seeks relief, and relief is granted, there is no issue for appellate review unless the party makes clear to the trial court that they are not satisfied with the relief chosen. Catlett's counsel was certainly satisfied with the relief the court gave in response to this objection. As we made clear in a similar circumstance:

> Instead, Appellant requested an admonition, and the trial court admonished the jury to disregard the testimony altogether. Appellant requested no other relief. As it appears that he "agreed with the trial court's approach and did not request any further curative measures, he received all the relief that he requested; thus there is no error to review."

27

*Blount v. Commonwealth*, 392 S.W.3d 393, 398 (Ky. 2013) (internal citations omitted).

The trial court resolved the disagreement between the parties by admonishing the jury that there was a disagreement over what Clem said. The admonition properly placed the recall over what Clem's actual testimony was in the jury's hands. Specifically, the trial court admonished the jury:

> With regard to this aspect of the testimony of Mr. Clem, there is disagreement between the defense and the Commonwealth about what his testimony is. Ultimately, you will be the arbiter of what his testimony was and you ultimately will be the determiner of what facts are important to your determination.

In summary, "no further relief was requested after the admonition was given, i.e., there was no request for a further admonition or a mistrial. Appellant received all the relief he requested . . . ; thus, there is no error to review." *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003) (internal citations omitted). As the issue is resolved on these grounds, we will not address Catlett's claim of prosecutorial misconduct or the Commonwealth's claim of invited error. We affirm the trial court's use of a corrective admonition.

### E. Alleged Highly Prejudicial and Irrelevant Crime Scene Evidence

Catlett next argues the trial court erred in allowing the admission of highly prejudicial and irrelevant evidence. The claim centers on the admission of evidence collected during the police investigation including spent shell casings recovered at the shooting location, hearsay statements of unnamed witnesses who told police shootings happened on Younglove Street all the time,

28

and several items recovered from the search of Teague's house. These alleged errors were unpreserved, and Catlett seeks palpable error review from this Court.

As previously noted, palpable error has many components:

> Under RCr 10.26, an unpreserved error may be reviewed on appeal if the error is "palpable" and "affects the substantial rights of a party." Even then, relief is appropriate only "upon a determination that manifest injustice has resulted from the error." An error is "palpable," only if it is clear or plain under current law. Generally, a palpable error "affects the substantial rights of a party" only if "it is more likely than ordinary error to have affected the judgment." We note that an unpreserved error that is both palpable and prejudicial, still does not justify relief unless the reviewing court further determines that it has resulted in a manifest injustice; in other words, unless the error so seriously affected the fairness, integrity, or public reputation of the proceeding as to be "shocking or jurisprudentially intolerable."

*Miller*, 283 S.W.3d at 695 (internal citations omitted).

### 1. Unmatched shell casings and hearsay statement

Hopkinsville Police Department Evidence Technician, Morgan Legamon, recovered four .40 caliber casings and two 9mm casings at the crime scene near where Smith was shot. Evidence Technician Josh Turner testified the items were Smith and Wesson brand 9mm and .40 caliber casings. These caliber and brand identifications are important when viewed in conjunction with the testimony of KSP Central Crime Lab firearms examiner Lawrence Pilcher.

Pilcher examined two spent projectiles recovered at Smith's autopsy by Medical Examiner, Dr. Christopher Kiefer. Pilcher determined the two projectiles were fired from the same gun, a revolver, and were most consistent

29

with .38 Special or a .357 Magnum ammunition. The importance of Pilcher's conclusions for this case are that a semi-automatic handgun ejects spent casings as the rounds are fired, while a revolver does not. The shell casings at the scene were the type ejected by a weapon when it fired.

Because none of the shell casings matched the caliber of the projectiles recovered from Smith's body, Catlett argues they were irrelevant. Unlike the .38 caliber ammunition found in Teague's house (which did match the type of projectile that killed Smith) the casings had no connection to the gun that caused Smith's injuries or death. We agree with Catlett's argument concerning relevance.

KRE 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In this case, Pilcher's conclusions that the projectiles in Smith's body were most likely .38 caliber and fired from a revolver, made the unmatched shell casings irrelevant. The casings may have been evidence of prior gunfire by at least two other weapons, but not that those weapons were fired at that location—or on the night in question. It is equally possible the casings were simply dumped in that location. Furthermore, there was no evidence or testimony about a second shooter. In any event, the casings ended up in the street where Smith was shot, and they did not assist the jury in deciding any questions in this case.

Since none of the shell casings match the projectiles recovered from Smith's body, it is a reasonable conclusion that the shooter took the murder weapon with him. If Catlett was the shooter (the fundamental issue at trial), Hill saw him retrieve a handgun from a white SUV and leave the scene in that same vehicle. A reasonable inference can be drawn that he took the gun with him. A shooter fleeing the scene with the murder weapon explains why no gun was ever found to test for a match with the recovered projectiles or shell casings.

Catlett further argues that the shell casings were highly prejudicial and should have been excluded. Catlett argues that the shell casings made it appear that he, if he were present that night, was partying in a high crime area. The implication was that Catlett hung out with bad people, or at least people who fired multiple caliber guns in the street and left their spent shell casing lying around on the ground. This inference is not particularly strong, except it must be viewed in conjunction with hearsay statements that shootings happened on Younglove Street all the time.

Detective Green advised that he and other officers conducted a neighborhood canvas the morning Smith was shot. Nobody would tell police they saw anything when Smith was shot. Statements not attributed to any specific witness indicated that shootings happened on Younglove Street all the time. When questioned further, Detective Green said he was not aware of any other shootings or being called to that location for any shootings. No objection was made to this statement.

31

KRE 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." In this case, there is no indication that the police received this information and then acted on it. This is someone's opinion with no supporting facts and was offered by Detective Green as the sole result of an otherwise fruitless police neighborhood canvas.

However, the statement does paint a prejudicial picture of Younglove Street. In this case, the defendant, the victim, and the witnesses not connected to law enforcement were African American. The description of the block party included drinking, loud music, and the police eventually being called for noise complaints.

As this claim of error was not preserved at trial, we must determine if it rose to the level of palpable error. RCr 10.26 provides: "A palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." To determine what level of error reaches manifest injustice, we look to our recent decision in *Iraola-Lovaco v. Commonwealth*, 586 S.W.3d 241 (Ky. 2019). There, we found the claim of manifest injustice fell short concerning the vocabulary used by the officer in describing the field sobriety tests he administered when compared to the overwhelming evidence of intoxication. We held there was no palpable error in that case.

32

In this case, when we compare the shell casings and the lone hearsay statement with the other evidence, we conclude it falls short of the amount necessary to support Catlett's claim of manifest injustice. Although witnesses gave varying accounts of the shooting each from their own vantage point, Hill identified Catlett as the man she saw retrieve a gun and later flee the scene. Cousar, waiting until he was sure in his own mind about who he saw, identified Catlett as the man he saw, and he felt fired the shots.

Catlett's physical characteristics matched witness descriptions of a short, dark-skinned man with dreadlocks who fired the gun. In multiple descriptions given to police, witnesses described a man in a red shirt, and police found a red shirt in Catlett's room at his sister's house. Significantly, that shirt had lab confirmed gunshot residue on it. Finally, Catlett fled the state and was arrested for giving the police a false name ten days after the shooting in Evansville, Indiana with his hair cut short.

When compared to the other evidence, the unmatched shell casings and the lone hearsay statement about Younglove Street do not reach the level of manifest injustice.

### 2. Evidence recovered from Teague's house

We now turn to items recovered from Teague's house when police executed a search warrant. The items included 9mm bullets, various bags of marijuana, .40 caliber gun magazine, several cell phones, Ziploc bags containing a white powdery substance, two boxes of .38 caliber ammunition, and digital scales. The police also located mail and identification cards that

indicated Teague was at least staying at the house. Catlett raised no objections at trial, and as noted above, seeks review for palpable error.

Catlett claims that the evidentiary items inferred Teague was a drug dealer—and perhaps a violent one. Catlett argues that cast a bad light on him, as some witnesses claimed he was at the house and that he was Teague's friend. However, not only was the evidence not objected to at trial, the record reveals that Catlett used the evidence he now complains about to point the finger of blame at Teague as the shooter.

A review of the record makes clear that the materials found at Teague's house were not attributable to Catlett. No witnesses testified that Catlett was ever in the house. Some witnesses claimed he was on the porch, while others (including Teague and Taylor) said he was not there that evening. No evidence of a drug deal interrupted or gone bad was ever offered. Until Smith and Teague got into an argument, many witnesses described the general mood of the crowd as good.

According to Pilcher, the Central Crime Lab Firearms Examiner, the projectiles that were retrieved from Smith's body by Dr. Kiefer were .38 caliber ammunition. During the police search, boxes of .38 caliber ammunition were found, a point Catlett raised in closing argument. After all, why have .38 caliber ammunition if you don't have a .38 caliber gun?

We also note that when the Commonwealth called Teague to testify, he appeared in an orange jail jumpsuit and leg shackles. Teague walked across the courtroom in front of and in full view of the jury before he sat in the

34

witness seat. Teague's testimony can fairly be described as riddled with forgetfulness and denials.

Catlett's claim that Teague had the motive to kill Smith, that he was connected to the caliber of handgun that killed Smith, and he threatened Smith during the argument by saying "I am a real killer. I will break you in half," (according to Myesha Hill) could not have been better presented by the defense. No other witness at this trial was so dangerous that he needed to be brought from the jail in leg shackles to testify as Teague was. The Commonwealth's proof about Teague was some of the best evidence that Catlett had for his claim of reasonable doubt about the shooter's identity.

The items found at Teague's house, including the .38 caliber ammunition, did not prejudice Catlett. If anything, that evidence helped Catlett in his efforts to convince the jury there was reasonable doubt that he was the shooter. "A non-constitutional evidentiary error such as this one is harmless if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Harris v. Commonwealth*, 384 S.W.3d 117, 125 (Ky. 2012). In this case, we hold Catlett's substantial rights were not affected.

In summary, we conclude that no manifest injustice occurred in the admission of the unmatched shell casings or the isolated hearsay statement. We further conclude that any error, if there was any, in the admission of the items from the search of Teague's house, was not palpable.

## F. Inadmissible Hearsay Admitted During Lieutenant DeArmond's Testimony

Catlett next argues the trial court erred in allowing the admission of two hearsay statements. The first of the statements was made by an unknown person in the crowd at the shooting scene and the second by a narcotics detective connecting the nickname "50" to Catlett. Catlett asserts the two hearsay statements are impermissible "investigative hearsay" and had no legitimate non-hearsay purpose. Catlett acknowledges the error is unpreserved and seeks review as palpable error.

As previously noted:

> Under RCr 10.26, an unpreserved error may be reviewed on appeal if the error is "palpable" and "affects the substantial rights of a party." Even then, relief is appropriate only "upon a determination that manifest injustice has resulted from the error." An error is "palpable," only if it is clear or plain under current law. Generally, a palpable error "affects the substantial rights of a party" only if "it is more likely than ordinary error to have affected the judgment." We note that an unpreserved error that is both palpable and prejudicial, still does not justify relief unless the reviewing court further determines that it has resulted in a manifest injustice; in other words, unless the error so seriously affected the fairness, integrity, or public reputation of the proceeding as to be "shocking or jurisprudentially intolerable."

*Miller*, 283 S.W.3d at 695 (internal citations omitted).

Lieutenant DeArmond testified to both statements. We begin with a brief review of his role in the investigation. When the radio dispatch call went out about the shooting, Lieutenant DeArmond went to the scene. However, once there, he did not actively lead the investigation. Instead, he designated Detective Green as the lead detective. Lieutenant DeArmond testified that he assisted with crowd control at the scene. While performing that function, he

36

heard someone in the crowd yell out "50 did it." Lieutenant DeArmond was unable to tell who made the statement. The nickname was not familiar to him or the other officers at the scene.

After he returned to the Hopkinsville Police Department, Lieutenant DeArmond contacted Detective Bagby from the narcotics division for assistance. Detective Bagby checked narcotics intelligence reports and files to determine if the name "50" was connected to anyone in police records. Detective Bagby provided Lieutenant DeArmond with Catlett's name in connection to the alias.

The next step taken by Lieutenant DeArmond was the creation of a photo array from photos downloaded from the Justice Exchange. Lieutenant DeArmond provided a photo array to Detective Garcia. We have previously reviewed the events that followed the creation of the photo array. Lieutenant DeArmond had no further role in the investigation of this case.

Lieutenant DeArmond testified at trial about his role in the investigation. He testified about someone in the crowd yelling out the name "50" and about Detective Bagby providing Catlett's name after searching police records. No one from the crowd was identified and called to testify. Detective Bagby was not called to testify. No objection was raised at trial by Catlett to the two statements, and he now seeks palpable error review.

Catlett asserts that: "The statements have no legitimate non-hearsay use." *Moseley v. Commonwealth*, 960 S.W.2d 460, 461 (Ky. 1997). In *Moseley*, this court referenced *The Kentucky Evidence Law Handbook* with a quote

37

explaining the distinction between non-hearsay use and simple hearsay. *Id.* at 461-62. That quote is worth repeating here:

> A legitimate non-hearsay use of an out-of-court statement always involves relevancy in the *mere utterance of the words* comprising the statement (i.e., a logical connection between the utterance of the words and some material element of the case). Absent such relevancy, a claim of non-hearsay must be regarded as nothing more than a pretext for violating the hearsay rule.

R. Lawson, *The Kentucky Evidence Law Handbook*, § 8.05, p. 361 (3rd ed., Michie, 1993).

A review of the record reveals that Lieutenant DeArmond did have a non-hearsay use for the information he related to the jury: those statements explained why he assembled the photo array. The identity of the shooter was the primary issue at trial.

"Extrajudicial statements to a police officer are inadmissible hearsay unless offered to explain the basis for the action later taken by the police officer." *Kerr v. Commonwealth*, 400 S.W.3d 250, 257 (Ky. 2013). In this case, both statements were the only information Lieutenant DeArmond had to begin his part in the investigation and were, thus, relevant. The two statements were a critical part of Lieutenant DeArmond's work on the photo array.

In the hours immediately following the shooting, numerous police officers and technicians were investigating the fatal shooting by collecting evidence at the scene, canvasing the neighborhood, and talking to witnesses (including some witnesses at the hospital). Lieutenant DeArmond decided to contribute to the investigation by accessing police records with the limited amount of information he had about the shooter's identity. Hill gave Detective Garcia a

38

description of a short man with dark skin tone and a dreadlock hair style that she saw retrieve a gun from a white SUV. Lieutenant DeArmond used that description when he created the photo array. However, Hill did not know a name or a nickname for the person she saw get the gun out of the SUV.

The only name Lieutenant DeArmond had to work with was the nickname "50" yelled out by someone in the crowd at the scene. It was not much to go on and had no indication of reliability, however, it was the only name police had. Detective Bagby connected the alias "50" to Catlett. The pressing need to know if Catlett was the right person nicknamed "50" led to his inclusion in the photo array. If Hill did not select him as the person she saw that night, police needed to look further for someone nicknamed "50." Once Hill selected Catlett's photograph from the array a few hours after the shooting, the police investigation focused on Catlett. However, until Hill made her identification, Catlett was only a person of interest.

Detective Bagby provided Lieutenant DeArmond with Catlett's name, but, unlike the unidentified person in the crowd who yelled out "50 did it," there is no indication in the record that Detective Bagby was unknown or unavailable as a witness at trial. The record reveals no reason why the Commonwealth failed to call him as a witness.

"It is well-established that investigative hearsay is still, fundamentally, hearsay and, thus, disallowed. However, it is equally evident that not all testimony from a police officer concerning an investigation is hearsay."

39

*Chestnut v. Commonwealth*, 250 S.W.3d 288, 294 (Ky. 2008) (internal citations omitted). The most recognized exception is the verbal acts doctrine:

> "The rule is that a police officer may testify about information furnished to him only where it tends to explain the action that was taken by the police officer as a result of this information *and* the taking of that action is an issue in the case." Such testimony is then admissible not for proving the truth of the matter asserted, but to explain why a police officer took certain actions.

*Id.* (internal citations omitted).

Even if the hearsay is admissible as a verbal act, the trial court must keep "a short leash" on its admission. The problems inherent with this type of hearsay were laid out by this court long ago when we:

> limited such testimony to circumstances where the taking of action by the police is an issue in the case and where it tends to explain the action that was taken as a result of the hearsay information. In such circumstances, hearsay may be admissible to prove why the police acted in a certain manner, but not to prove the facts given to the officer.

*Gordon v. Commonwealth*, 916 S.W.2d 176, 179 (Ky. 1995).

In this case, it is clear from the record that Lieutenant DeArmond had no way of knowing if someone nicknamed "50" fired the fatal shots. Lieutenant DeArmond acted upon the information he had by inquiring if police records had anything to offer that might lead them to the shooter's identity. During his testimony, Lieutenant DeArmond never offered the crowd statement as the truth; instead he explained the nickname "50" was a lead—and in fact, the only lead police had in the early morning hours after the shooting. Lieutenant DeArmond sought to determine if what the crowd shouted out had value to police and his actions occurred because of the statement.

40

The second statement was from Detective Bagby. Narcotics intelligence files produced one person with a nickname of "50": Catlett. But, that did not mean Catlett was the shooter. There could be other persons nicknamed "50" who may not have had run-ins with narcotics investigators. Lieutenant DeArmond's next actions would determine if police had a viable suspect in Catlett.

The next step taken by Lieutenant DeArmond in response to Detective Bagby's information was to create a photo array containing Catlett's photo. Only after Hill made her identification of Catlett did the police focus on him as their main suspect. At the same time, police continued to investigate Teague as the possible shooter, gathering evidence that would prove useful to Catlett at trial.

Lieutenant DeArmond explained that Catlett's picture was included in a photo array because Detective Bagby provided him with Catlett's name. The photo array led police to investigate Catlett's residence and send out an arrest warrant for him within hours. The photo identification was challenged pretrial and Hill's trial identification of Catlett was also rigorously challenged during cross-examination.

The background of why Catlett's photo was included in the photo array was critical in the Commonwealth's case. The police investigation and the proof it developed against Catlett flowed from that initial photo array identification. We have made clear that the challenged evidence must explain the officer's action and be an issue at trial. We have held:

41

Importantly, however, the "relevancy [of such statements] does not turn on whether the information asserted tends to prove or disprove an issue in controversy, but on whether the action taken by the police officer in response to the information that was furnished is an issue in controversy . . . . The rule is that a police officer may testify about information furnished to him only where it tends to explain the action that was taken by the police officer as a result of this information *and* the taking of that action is an issue in the case.

*Brewer*, 206 S.W.3d at 351–52. In this case, the requirements we laid out in *Brewer* were met.

Finally, Catlett asserts the admission of "50 did it" was a constitutional error. However, having made that conclusory statement, Catlett's brief does not offer justification in support of it. We decline to so find.

In summary, we find no palpable error and as a result find no manifest necessity requiring reversal. The two statements, "50 did it" and Catlett's name provided by Detective Bagby, clearly fall within the verbal acts doctrine. Both were offered to show why Lieutenant DeArmond created the photo array with Catlett's photo as one of the six choices. Hill's identification of Catlett gave direction to the police investigation.

### G. Failure to Trifurcate Proceedings

Finally, Catlett argues the trial court erred in failing to trifurcate the penalty phase. Catlett claims the error is preserved because the issue was raised pretrial. However, when presented with an opportunity to renew the request for severance and trifurcation, Catlett accepted the trial court's proposal to bifurcate. After careful review, we find no error as no objection was raised by Catlett and he does not seek review as palpable error.

42

The trial court and parties agreed that at some point there had to be severance of the possession of a handgun by a convicted felon charge. We determined almost four decades ago that: "The two-stage proceeding in persistent felony-offender cases was designed for the specific purpose of obviating the prejudice that necessarily results from a jury's knowledge of previous convictions while it is weighing the guilt or innocence of a defendant on another charge." *Hubbard v. Commonwealth*, 633 S.W.2d 67, 68 (Ky. 1982) (internal citations omitted). What remained for the parties and trial court to resolve after the pretrial conference was the question of how the severance was to be handled. The choices included severance and a separate trial for the possession of a handgun charge, bifurcation of the charges moving the handgun count to the penalty phase for a jury determination of guilt or innocence while also having a penalty set for the murder charge, or trifurcation involving a separate determination for the handgun charge followed by a penalty phase to make sentencing recommendations on all counts.

We have made clear that trifurcation is permissible, but not required: "trying the robbery charges and severed charge of possession of a handgun by a convicted felon in one trial with a bifurcated guilt phase followed by a consolidated penalty phase is not an *inherently* inappropriate means of complying with the purposes and requirements of Criminal Rule 9.16 and *Hubbard*, 633 S.W.2d 67." *Wallace v. Commonwealth*, 478 S.W.3d 291, 306 (Ky. 2015).

43

However, while trifurcation is permissive, it is not required. The goal of severance is to avoid prejudice to a party. By moving the handgun charge to the penalty phase, prejudice is alleviated. In this case, this was especially so as the jury also was asked to determine if Catlett was guilty of being a persistent felony offender (PFO) in the first degree. Once that was determined, the jury would set a sentence for the handgun count and make an enhancement decision based on the PFO for the handgun charge. In summary, the trial court was acting within its discretion when it made the decision to utilize a bifurcated proceeding instead of a trifurcated proceeding.

As we noted above, there is no further need to delve into the trial court's decision to utilize a bifurcated proceeding. After the close of all evidence, the trial court, the attorneys, and Catlett met in chambers to hear final directed verdict motions, review proposed jury instructions, and plan for sentencing procedures. In reviewing possible eventualities from a jury verdict, the trial court and Catlett's counsel conducted the following exchange:

Trial Court: The terminus of the trial will either be a not guilty verdict—

Counsel: Exactly

Trial Court: —a mistrial, or a guilty verdict and then completion of the penalty phase with all the charges in the indictment.

Counsel: Thank you, judge.

Trial Court: Okay? Make sense?

Counsel: Yes.

No objection was raised to the trial court's decision and no further request for trifurcation was raised. In this case, the trial court was in the best position to determine the appropriate level of separation necessary and clearly Catlett agreed when the trial court advised the parties of the plan to proceed with the remaining charges and sentencing. Catlett seeks to have this court rule that trifurcation is mandated by Kentucky's sentencing statutes. We decline to do so. We find no error in the trial court's decision to bifurcate instead of trifurcate the sentencing proceedings.

## III. CONCLUSION

For the foregoing reasons, we affirm Catlett's convictions and corresponding sentences.

All sitting. Minton, C.J.; Hughes, Lambert, Nickell, VanMeter, and Wright, JJ., concur. Keller, J., concurs in result only.


COUNSEL FOR APPELLANT:

Adam Meyer
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Micah Brandon Roberts
Assistant Attorney General